# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROLANDO RODRIGUEZ, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11521-RCL |
| | ) | |
| LOIS RUSSO, | ) | |
| Respondent. | ) | |

## RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE PETITION FOR WRIT OF HABEAS CORPUS

The respondent hereby submits this memorandum in opposition to the petition for writ of habeas corpus filed by Rolando Rodriguez (the "petitioner"). In his habeas petition, the petitioner contends that the writ should be granted because the state court violated the Due Process prohibition against fundamental unfairness by: (1) instructing the jury regarding the presumption of innocence in such a way that the instruction shifted the burden of proof to the petitioner; (2) instructing the jury regarding the evaluation of expert witness testimony in such a way that the instruction shifted the burden of proof to the petitioner; (3) failing to give a curative instruction concerning the purpose of the expert witness's testimony and admitting expert witness testimony that failed to satisfy the proper standard; and (4) allowing the prosecutor to impermissibly assume facts not in evidence and not inferable from the evidence when questioning the expert witness and in his closing argument and to appeal to the jury's sympathy. Further, the petitioner claims that his Sixth and Fourteenth Amendment rights to effective assistance of counsel have been violated where: (5) trial counsel failed to object to and move to

strike certain errors at trial and failed to request certain curative instructions.  *See* Pet. at 8-14.[1]

As argued in this memorandum, the petition should be denied where it contains unexhausted as well as procedurally defaulted claims and where the state court's adjudication was not contrary to, nor an unreasonable application of clearly established Supreme Court law.

## STATEMENT OF THE CASE

On June 3, 1997, a Suffolk County Grand Jury returned two indictments charging the petitioner, with first-degree murder, in violation of G.L. c. 265, § 1, and armed robbery, in violation of G.L. c. 265, § 17 (Indictment Nos. 97-10799-001 and 002).  *See* S.A. Vol I, Ex. 1 at 3.  An evidentiary hearing on the petitioner's motion to suppress statements was held on September 28, 1998, which Judge Daniel Ford denied in a written decision issued on September 29, 1998.  *See Id*. at 5.  The jury trial commenced on November 16, 1998, before Judge Regina Quinlan.  *See Id*.  On November 25, 1998, the jury returned guilty verdicts on both the first-degree murder (felony murder) and armed robbery.  *See Id*. at 7.  That same day, the Court sentenced the petitioner to a mandatory life sentence without the possibility of parole for first-degree murder and to a concurrent nineteen-to-twenty year term for the armed robbery.  *Id*.

The petitioner filed a motion for new trial in the Superior Court on October 6, 2000.  *Id*. at 8.  Following a December 13, 2000, hearing on the petitioner's motion, Judge Quinlan vacated the sentence and conviction on the armed robbery indictment as being duplicative.  *Id*. at 9.  Subsequently, on March 12, 2001, Judge Quinlan, in a written order, declined to address the

---

[1] The respondent herein references the Petition for Writ of Habeas Corpus as "Pet. at __." References to the petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus will be "Pet. Mem. at __."  References to the Supplemental Answer will be " S.A. Vol __ Ex. __ ."

merits of the petitioner's claims in his motion for new trial. *Id.* The petitioner filed a notice of appeal on March 27, 2001. *Id.*

On March 10, 2003, the Supreme Judicial Court of Massachusetts ("SJC") issued a rescript opinion to the trial court affirming the judgment and denial of the motion for new trial. *Id.* On October 28, 2003, the petitioner filed a pro se motion for reduction in verdict or new trial pursuant to Mass. R. Crim. P. 28(b)(2). The instant petition for writ of habeas corpus was filed with this Court on July 15, 2005.

## STATEMENT OF THE FACTS

The recitation of the underlying facts by the Supreme Judicial Court is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *Dolinger v. Hall*, 302 F.3d 5, 7 n. 5 (1st Cir. 2002). The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). As the United States Court of Appeals for the First Circuit has noted, "[a] habeas petitioner must clear a high hurdle before a federal court will set aside any of the state's factual findings." *Mastracchio v. Vose*, 274 F.3d 590, 598 (1st Cir. 2001). The state court's findings of fact can be overcome only if the petitioner demonstrates that they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." *Id.* at 597-98, *quoting* 28 U.S.C. § 2254(d)(2). In *Rodriguez*, the SJC summarized the evidence supporting the petitioner's conviction as follows:

### *The Commonwealth's Case*

The victim, thirty -two year old Kenia Melo, owned and operated a small convenience store, the Steven Jr. Market, in Chelsea, along with her husband Juan Luis Pimental. On Sunday, April 13, 1997, Melo and Pimental arrived at the market around 9 a.m., along

with their son and daughter (six and seven years old). On arriving, Pimental took his son downstairs to the basement of the market to take a nap in the bedroom. Melo and her daughter remained upstairs in the store. At approximately 11:30 a.m., Norma Rosado, a woman living across the street from the market, observed a thin, dark-skinned man, wearing a baseball cap and jeans, walk into the market. She noticed bottles of shampoo and other items falling from the shelves of the market immediately after the man entered. Rosado then observed a local woman approach the market, scream, and run away. Shortly thereafter, she saw the same man leave the market without a baseball cap, and walk away counting money.

Gloria Magana went to the market twice that morning. As she approached on her second visit, she heard Melo screaming for her husband. Magana briefly entered the market and saw a young man on top of the counter, struggling with Melo. The man was stretched out across the counter with his chest on the counter top and his legs dangling in the air as he reached for the cash register. Magana fled from the market as the man threw himself to the floor, and as she left she heard Melo scream to her, "Gloria, Gloria, call the police, because I've been stabbed."

Meanwhile, Pimental was awakened by the commotion in the market upstairs. He heard the screams of his daughter calling down to him, "Pappy, Pappy, there is a thief." Pimental ran upstairs and saw a man lying on the counter with his feet dangling in the air. He grabbed a can from a nearby shelf and threw it at the man as he ran from the market. Pimental observed money in the man's hand as he opened the door to leave the market.

Pimental then turned his attention to his wife who stood bleeding by the entrance to the counter. She told her husband that she did not know the man who had stabbed her and that the baseball cap and knife that had been left behind in the market belonged to her attacker. Pimental lay on the floor of the market with his wife as police and emergency medical personnel began to arrive. An officer on the scene administered first aid to Melo, but was unable to stop the flow of blood from her back. Melo lost consciousness as she was being transported from the market and died shortly thereafter. According to the medical examiner, Melo died of multiple stab wounds and the resultant blood loss.

[Defendant] came to Massachusetts from Puerto Rico in late February, 1997, and was living in Chelsea with his cousin, Theresa Santiago, three blocks from the market. Also living in the house were Santiago's three children and her roommate, Carmen Febres. Santiago was at home on April 13, 1997, and saw [defendant] sleeping in his bedroom at 6 a.m. that morning. When she next saw [defendant] around noon that day, he had just showered and was cleaning the rug in his bedroom. She observed scratches on his face and noticed that he had been doing laundry despite the fact that it was not his assigned

laundry day.[2]  Santiago also noticed that a large white-handled knife that she had used the previous night was missing from her kitchen block set.

Both Santiago and Febres testified that [defendant] appeared nervous and edgy on the afternoon of April 13 and into the next day, often looking out the windows and refusing to go outside.  On April 15, after reading a newspaper article about the incident at the market, Febres and Santiago confronted [defendant] and asked him whether he was involved.  [Defendant] did not answer but asked to speak with Santiago privately, because she was "family."  During this private conversation, [defendant] stated, "Yes, it was me, but it was not me," and "I did it, but I don't know how I did it."  He pleaded with Santiago to "let him go" and not to turn him in to police.  Santiago telephoned [defendant]'s relatives in Puerto Rico and, along with Febres, listened to the conversation on another extension while [defendant] spoke to his father.  They overheard [defendant] admit his involvement in the killing to his father and tell him that he wanted to return home to Puerto Rico.

Immediately after the telephone call, Febres left the apartment and drove to the Chelsea police department to inform police of [defendant]'s involvement in the killing.  Soon after Febres departed, [defendant] also left the apartment.  He was subsequently arrested at South Station at approximately 12:15 a.m. on April 16, 1997.  When he was interviewed by police, he admitted his involvement in the robbery at the market.  [Defendant] told police that he remembered going to the market with a knife, struggling with a woman behind the counter, and taking money from the register, but stated that he did not remember stabbing the victim.

***The Defense***.

[Defendant] testified at trial and called an expert forensic psychologist to support his claim that he lacked specific intent to kill or commit robbery.  On direct examination, [defendant] testified that he drank alcohol and smoked marijuana on the afternoon of April 12, 1997, and continued to drink and smoke into the night at a nearby party.  After leaving the party, [defendant] bought crack cocaine in a local park and smoked it throughout the night and into the morning hours of April 13.[3]  He testified that he returned home to the apartment in Chelsea at some point that morning, but that he had no

---

[2]Footnote 2 states: Santiago testified that each member of the household had assigned days on which they were to do their laundry and that Sunday was not [defendant]'s assigned day.

[3]Footnote 3 states: [Defendant]'s testimony that he was on an all-night drinking and drug binge on April 12, and into the morning hours of April 13, was contradicted by testimony from Febres, Santiago, and Santiago's son.  Febres testified that she saw [defendant] at home before midnight on April 12, and all three witnesses testified that they saw [defendant] sleeping in his bed early on the morning of April 13.

memory of leaving the apartment again or of taking a knife or cap with him at any point. Likewise, he did not recall going to or being inside the market on April 13. He did, however, remember being in an enclosed area, seeing a shadow, being grabbed, and falling on top of something.

[Defendant] claimed the next thing he remembered about April 13 was waking up in his bed and noticing money in his possession that was stained with blood. He felt scared and confused over the following hours and days as he heard about the incident at the market from Santiago and various media accounts. While he did not remember the incident, [defendant] came to assume that he had been involved in the killing at the market. After speaking to Santiago, he attempted to fly back to Puerto Rico on April 15, but was unsuccessful in booking a flight. [Defendant] was at South Station intending to board a bus to New Jersey when he was arrested.

Dr. Alan Brown, a forensic psychologist, testified that, assuming a person had ingested a large quantity of crack cocaine, marijuana, and alcohol without sleep and without food, "it would be extremely unlikely that he would be able to form the specific intent" to rob or to kill. He also testified that a person having ingested the quantities of drugs and alcohol claimed by [defendant] would be impaired in his ability to think through problems, make rational choices, and remember his thoughts and actions.

*Commonwealth v. Rodriguez*, 437 Mass. 554, 556-559 (2002);.

## ARGUMENT

**I.    THE PETITIONER IS NOT ENTITLED TO HABEAS CORPUS RELIEF WHERE HIS JURY INSTRUCTION CLAIMS REGARDING THE PRESUMPTION OF INNOCENCE, THE EVALUATION OF EXPERT WITNESS TESTIMONY AND HIS CLAIM THAT THE TRIAL COURT ERRED BY ALLOWING CONSCIOUSNESS OF GUILT EVIDENCE AT TRIAL ARE PROCEDURALLY DEFAULTED AND HE HAS FAILED TO ESTABLISH CAUSE AND PREJUDICE OR SHOW THAT A MISCARRIAGE OF JUSTICE WILL RESULT IF THE CLAIMS ARE NOT REVIEWED.**

"The habeas corpus anodyne is designed neither to provide an additional layer of

conventional appellate review nor to correct garden-variety errors, whether of fact or law, that

may stain the record of a state criminal trial. Rather, the remedy is limited to the consideration of

federal constitutional claims." *Burks v. Dubois*, 55 F.3d 712, 715 (1st Cir. 1999). *See Herrera v.*

*Collins*, 506 U.S. 390, 400 (1993) (affirming that the purpose of federal habeas corpus review is

to ensure that individuals are not imprisoned in violation of the Constitution). *See also Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials"). Thus, federal habeas review is precluded, as a general proposition , when a state court has reached its decision on the basis of an adequate and independent state-law ground. *See Coleman v. Thompson*, 501 U.S. 722 (1991). In Coleman, the Supreme Court held that where:

> a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. *See Horton v. Allen*, 370 F.3d 75 (1st Cir. 2004); *Tart v. Massachusetts*, 949 F.2d 490, 496-97 (1st Cir. 1991); *Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 493 (1st Cir.), *cert. denied sub nom.*, *Palmariello v. Butler*, 493 U.S. 865 (1989). A petitioner's procedural default constitutes an adequate and independent state ground so long as the state consistently applies the rule and has not waived it. *Horton v. Allen*, 370 F.3d 75 ( 1st Cir. 2004); *Gunter v. Maloney*, 291 F.3d 74, 79 (1st Cir. 2002); *Burks v. Dubois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir. 1987), *cert denied*, 485 U.S. 990 (1988). The jurisdictional nature of the independent and adequate state ground requires that it be addressed by this Court at the outset. *Lambrix v. Singletary*, 520 U.S. 518, 523-24 (1997).

The petitioner raises three issues within his petition that are in procedural default. Petitioner claims that the jury instructions on the presumption of innocence and the evaluation of expert witness testimony unconstitutionally shifted the burden of proof in violation of his due process rights under the Fourteenth Amendment of the United States Constitution. Petitioner further claims that the trial judge erred in failing to strike consciousness of guilt evidence elicited

during cross-examination and to either give a curative instruction or a consciousness of guilt instruction in violation of his due process rights under the Fourteenth Amendment of the United States Constitution.[4]  *See* Pet. Mem. at 5, 8, 13.  No timely objection was made at trial as to any of these claims.  *See Rodriguez*, 437 Mass. at 559, 563; S.A. Vol I, Ex. 4.  Because these claims were raised for the first time on appeal, without objection in the trial court, the SJC reviewed the issues only to determine whether the jury instructions or the trial judge's alleged error created a substantial likelihood of a miscarriage of justice in accordance with the standard identified in *Commonwealth v. Gunter*, 427 Mass. 259, 266 (1998) and *Commonwealth v. Squailia*, 429 Mass. 101, 105 (1999).  *See id.*

Massachusetts has "a long standing rule that issues not raised at trial...are treated as waived...."  *Commonwealth v. Curtis*, 417 Mass. 691, 626 (1994).  The rationale behind the waiver doctrine is that a defendant who fails to bring his claim to the attention of the reviewing court at the earliest possible time waives his right to the court's resolution of that claim.  *See Lykus v. Commonwealth*, 432 Mass. 160, 163 (2000) (*quoting Commonwealth v. Pisa*, 384 Mass. 362, 365-66 (1981)).  Thus, in Massachusetts, appellate review of waived claims is limited to the discretionary standard of whether the claimed transgression created a substantial risk of miscarriage of justice.  *See Horton v. Allen*, 370 F.3d 75 (1st Cir. 2004); *Burks v. Dubois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F.2d at 1199.  Here, the SJC clearly reviewed the procedurally barred claims under that standard.  *See Rodriguez*, 437 Mass. at 559, 563; S.A. Vol I, Ex. 4.

_____

[4] The petitioner raises this issue in conjunction with his claim that "the expert witness's testimony on cross-examination failed to satisfy the proper standard." *See* Pet. Mem. at 13. Although the issues are raised together in petitioner's memorandum they will be dealt with separately in the respondent's memorandum because the latter issue was properly preserved in state court.

The limited review undertaken by the SJC pursuant to the Massachusetts "miscarriage of justice" standard does not operate as a waiver of the underlying procedural default. *Burks*, 55 F.3d at 716 n. 2. To the contrary, such review constitutes the "classic example of an independent and adequate state ground" supporting the application of the procedural default rule. *Simpson v. Matesanz*, 175 F.3d 200, 207 (1st Cir. 1999). Thus, this habeas court may consider the claims only if the petitioner establishes "cause and prejudice" with respect to the procedurally defaulted claims or demonstrate to this Court his actual innocence. *See Dretke v. Haley*, 541 U.S. 386, 391-94 (2004). The petitioner has made no attempt to show "cause," "prejudice," or a miscarriage of justice to excuse any of the defaults, nor can he. Consequently, the fact that petitioner does not even attempt to demonstrate cause for his defaults effectively ends the inquiry for this Court.

Although this Court need not consider the prejudice question, in fact, the petitioner could not demonstrate prejudice even if this Court assumes, *arguendo*, that the petitioner is able to show cause for his defaults. Prejudice requires the petitioner to demonstrate "not merely that the errors at...trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ortiz v. Dubois*, 19 F.3d 708, 714 (1st Cir. 1994) (*quoting United States v. Frady*, 456 U.S. 152, 170 (1982)). Petitioner can make no such presentation for any of his three defaulted claims.

**A.    The Jury Instruction On Presumption Of Innocence.**

The petitioner claims in his petition that the trial judge's jury instruction regarding the presumption of innocence violated his due process rights as provided for by the Fourteenth Amendment of the United States Constitution. The judge instructed the jury as follows:

> [t]he concept of presumption of innocence means exactly what it says. It means that the Commonwealth must prove the [d]efendant guilty of ... these offenses beyond a reasonable doubt, and a [d]efendant will have the benefit of that presumption of innocence, unless and until the Commonwealth has proven each and every element of the crime charged by that standard. It is only when the Commonwealth begins to introduce its evidence that this presumption in favor of innocence may begin to disappear. If the evidence against him goes in, the presumption may grow less and less strong, but it is for you to determine, based upon all of the evidence, whether or not the Commonwealth has overcome that presumption. (Emphasis omitted.)

*Rodriguez*, 437 Mass. at 560; S.A. Vol I, Ex. 4. The petitioner cannot show that the trial court's instruction created the type of prejudice required to excuse his default. As the SJC points out, the trial court's presumption of innocense instruction, "[c]orrectly informs the jury that they must determine, 'based upon all of the evidence,' whether the Commonwealth has overcome the presumption." *Id*. "The judge's other statements, such as, 'It is only when the Commonwealth begins to introduce its evidence that this presumption in favor of innocence may begin to disappear,' while not preferred, were simply a way of conveying to the jury that it takes evidence to overcome the presumption of innocence.'" *Id*. The SJC reasoned that, when viewing the instructions as a whole, the instructions adequately informed the jury that the presumption of innocence remained throughout the case. Such analysis fully comports with the Supreme Court's admonition that a challenged jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). The Court held that the instruction was not in error. *Id*. It is clear, considering the instruction as a whole, that the jury instruction was not erroneous and that it did not place the petitioner at an actual and substantial disadvantage, or infect his entire trial with error of constitution dimensions. *See Ortiz*, 19 F.3d at 714.

**B.**    **The Jury Instruction On Evaluation Of Expert Testimony.**

The petitioner also fails to show prejudice resulting from his claim that the jury instruction on the evaluation of expert testimony was erroneous and improperly shifted the burden of proof to the petitioner. The trial court instructed the jury:

> The testimony of an expert may be helpful in determining issues [that] are beyond your everyday experience. However, an opinion given by an expert should be disregarded if you find the assumptions upon which it is based have not been proven or if you determine that the opinion is no more than mere speculation or guess from subordinate facts which do not adequately support the conclusion reached.... However, you may accept the opinion of an expert where you find the basis facts to have been proven, and the way you find that those basic facts give adequate support to the expert opinion is for you to decide.

*Rodriguez*, 437 Mass. at 561; S.A. Vol I, Ex. 4. The trial court's instruction was not erroneous and did not prejudice the petitioner.

As the SJC stated, "where the expert opinion was based on hypothetical questions concerning the likely effect on the defendant of the ingestion of certain amounts of drugs and alcohol, under certain conditions, '[t]he jury should, on request, be instructed that it may give weight to the experts opinion only if it finds all of the assumed facts...to be true.'" *Id.*, *citing Commonwealth v. Taylor*, 327 Mass. 641, 649 (1951). Taking into consideration that the instruction itself was correct and that the trial judge repeatedly instructed the jury that it was the burden of the Commonwealth to prove that the defendant acted with the requisite specific intent, the petitioner was clearly not prejudiced by the instruction. *See id.* at 562. Specifically, the trial judge instructed the jury, "[a]s I told you before, a defendant is not required to prove to you an impairment of his mental capacity. The burden remains always on the Commonwealth to prove beyond a reasonable doubt the essential elements, and to prove in this instance that the [d]efendant had the mental capacity necessary for the various crimes...." *Id.* As such, the

11

petitioner can not show that the instruction placed him at an actual and substantial disadvantage, or infected his entire trial with error of constitution dimensions. *See Ortiz*, 19 F.3d at 714.

### C.    Consciousness Of Guilt Evidence.

Likewise, the petitioner fails to show prejudice resulting from his claim that the trial judge erred in failing to strike consciousness of guilt evidence elicited during cross-examination and to either give a curative instruction or a consciousness of guilt instruction. The prosecutor asked the expert on cross-examination: "Doctor, what about hypothetically in the aftermath of an event occurring...[h]e went to the store, the person being armed, the person running, disrobing, taking a shower, if the events immediately thereafter that person acted extremely nervous and edgy, would that have and impact on your opinion as to that individual's mental capacity to commit a crime?" *Rodriguez*, 437 Mass. at 564; S.A. Vol I, Ex. 4. Defense counsel objected to the question on a ground distinct from the issue raised here but the trial judge raised concerns about the jury convicting on consciousness of guilt evidence. *Id*. The prosecutor agreed to stay away from the question and the witness did not give an answer. *Id*.

As the SJC correctly reasoned, "where the prosecutor immediately stopped the line of questioning in light of the judge's stated concern about consciousness of guilt evidence, the witness never answered the question put to him regarding behavior after the incident, and the judge properly instructed the jury on consciousness of guilt in her charge, there was no error." *Id*. Therefore, it is clear that the petitioner cannot show that the consciousness of guilt question placed him at an actual and substantial disadvantage, or infected his entire trial with error of constitution dimensions. *See Ortiz*, 19 F.3d at 714.

Absent cause and prejudice sufficient to excuse his procedural default, the only other

avenue available to the petitioner - that a refusal to hear his default claim would result in a

"fundamental miscarriage of justice" - is foreclosed. *Simpson*, 175 F.3d at 210. This exception

to the procedural default rule is "seldom to be used, and explicitly tied to a showing of actual

innocence.'" *Killela v. Hall*, 84 F.Supp.2d 204, 210 (D. Mass. 2000) (quoting Burks, 55 F.3d at

717). Because no such showing has been or could be made here, petitioner's defaults cannot be

excused.

II.    **THE SJC'S HOLDING DISCERNING NO ERROR IN THE PROSECUTOR'S REFERENCE TO CERTAIN EVIDENCE DURING QUESTIONING OF THE EXPERT WITNESS AND IN CLOSING ARGUMENT AND HIS REFERENCE TO THE VICTIM'S FAMILY IN CLOSING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF SUPREME COURT LAW.**

A.    STANDARD OF REVIEW.

Because the subject petition was filed after the effective date of the Antiterrorism and

Effective Death Penalty Act ("the AEDPA"), this Court's review is governed by that act. *Lindh*

*v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA "places a new constraint on the power of a

federal habeas court to grant a state prisoner's application for a writ of habeas corpus with

respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412

(2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir.2000) ("a federal [habeas] court

operates within a closely circumscribed sphere"). In relevant part, the AEDPA precludes a

federal court from granting habeas relief, unless the state court adjudication "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),

or was based on "an unreasonable determination of the facts in light of the evidence presented in

the state court proceeding." 28 U.S.C. §2254(d)(2). In addition, under the AEDPA, state-court

determinations of factual issues "shall be presumed to be correct," unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). This "highly deferential standard for evaluating state-court rulings" reflects the overarching structure of the federal habeas corpus scheme, which vests "primary responsibility" for evaluating federal law claims raised in criminal trials in the state courts, courts which must be presumed in habeas corpus courts to know and follow the law. *Woodford v. Visciotti*, 537 U.S.19, 24, 27 (2002) (per curiam).

A state-court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (1) "if the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases; or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Taylor*, 529 U.S. at 405-06. Under either scenario, to satisfy the "contrary to" clause, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court precedent. *Id.*

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 413. In making this determination, a habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. The same objective unreasonableness standard applies to the "unreasonable determination of facts prong of § 2254(d)(2). *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Taylor*, 529 U.S. at 410. As the *Taylor* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one. *Id.* "Indeed, because Congress used the word 'unreasonable' . . . and not words like 'erroneous' or 'incorrect,' a federal habeas court 'may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application [or determination] must also be unreasonable.'" *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied*, 534 U.S. 925 (2001) (quoting *Taylor*, 529 U.S. at 411).

As the First Circuit sitting en banc held, "'some increment of incorrectness beyond error is required' . . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). If, for instance, the state court reaches a determination that is "devoid of record support for its conclusion or is arbitrary," the AEDPA's unreasonable application prong may be satisfied. *Id.* at 36-37 (citing *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)). Since "[a]pplying a general standard to a specific case can demand a substantial element of judgment," "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004). The clearly established law that is relevant to the analysis under § 2254(d)(1) is limited to the holdings of United States Supreme Court cases extant at the time of the state court decision, and does not include the dicta of such cases. *Id.* at 2147; *Williams*, 529 U.S. at 412.

Factual determinations of state courts are granted similar deference. To satisfy § 2254(d)(2), a petitioner must show that the state's factual determination was objectively unreasonable. *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)). Objective unreasonableness is not merely an incorrect or erroneous decision. *Williams*, 529 U.S. at 410; *see also Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) ("petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error."); *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003) ("federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination").

Moreover, § 2254(d)(2) must be interpreted in conjunction with § 2254(e)(1), which specifies both that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir.2001). *See also Miller-El,* 537 U.S. at 341 (noting that to prevail under § 2254(d)(2), habeas petitioner must both disprove the factual finding by clear and convincing evidence and demonstrate that the court's factual determination was objectively unreasonable).

**B.    Claims III(B) and IV are Unexhausted.**

It is well-established that "a federal court should not consider questions posed in a habeas petition until the 'power of the highest state court in respect to such questions' has been exhausted." *Mele v. Fitchburg District Court*, 850 F.2d 817, 819 (1st Cir. 1988), *quoting United States ex rel. Kennedy v. Tyler*, 269 U.S. 13, 17 (1925). *See Rose v. Lundy*, 455 U.S. 509, 518-19

16

(1982); *Adelson v. DiPaola*, 131 F.3d 259, 261-262 (1st Cir. 1997); *Dougan v. Ponte*, 727 F.2d 199, 202 (1st Cir. 1984); 28 U.S.C. §2254(b)(1)(A). The exhaustion principle, in addition to ensuring that state courts have the first opportunity to correct their own constitutional errors made in their proceedings, enables federal courts to accord appropriate respect to the sovereignty of the states and promotes comity by "minimiz[ing] friction between our federal and state systems of justice." *Rose*, 455 U.S. at 518. *See Duncan v. Henry*, 513 U.S. 364, 365-366 (1995); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1984); *Scarpa v. DuBois*, 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995); *Mele*, 850 F.2d at 819. *See also Ex parte Royall*, 117 U.S. 241, 251 (1886)(state and federal courts are "equally bound to guard and protect rights secured by the Constitution").

A claim in state court that contains a mere inkling of a federal claim, not one "likely to alert the court to the claim's federal nature," will not suffice for exhaustion purposes. *Nadworny v. Fair*, 872 F.2d 1093, 1098 (1st Cir. 1989), quoting *Daye v. Attorney General of New York*, 696 F.2d 186, 192 (2d Cir. 1982) (en banc), *cert. denied*, 464 U.S. 1048 (1984). *See Scarpa v. DuBois*, 38 F.3d at 6. It also is not enough that all the facts necessary to support the federal claim were before the state court, or that a somewhat similar state-law claim was made. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 276-277 (1971). *See Duncan v. Henry*, 513 U.S. at 366. Indeed, "[t]he exhaustion requirement requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references [that] hint that a [federal] theory may be lurking in the woodwork will not turn the exhaustion trick." *Martens v. Shannon*, 836 F.2d 715, 717 (1st

17

Cir. 1988). It is the petitioner's heavy burden to demonstrate that his now claimed federal errors were fairly presented to the state's highest court. *Nadworny v. Fair,* 872 F.2d 1093, 1098 (1st Cir. 1989). In order for it to be said that the petitioner has exhausted his state remedies as to his federal habeas claims, he must have presented the state court with appropriate federal trappings such as:

> specific constitutional language, constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument with no masking state-law character, ... such as would in all likelihood alert a reasonable jurist as to the existence of the federal question.

*Id.* at 1101. "The fewer the trappings that adorn a petitioner's state-court filings, the less likely that [a federal court] will find his federal claim to have been exhausted." *Adelson*, 131 F.3d at 262.

The petitioner claims that defense expert's opinions elicited on cross-examination where inadmissible where they were not base on a "reasonable degree of medical certainty," that the prosecutor violated his due process rights by impermissibly assuming facts that were not in evidence both in his questioning of the expert witness and in his closing argument and that the prosecutor impermissibly appealed to the sympathy of the jury. In his habeas memo, which is identical to his brief to the SJC, the petitioner fails to cite to relevant Supreme Court precedent as a basis for any of his above-mentioned federal due process arguments. *See* Pet. Memo, pp. 17-28. *See Gagne v. Fair*, 835 F.2d 6, 7 (1st Cir. 1987) (citation to constitutional right in issue caption was insufficient to satisfy exhaustion requirement). The failure to present the federal nature of the claims is further evidenced in the state court opinion, in which the SJC analyzes the claim under state law standards. *See Rodriguez*, 437 Mass. at 562-69; S.A. Vol. I, Ex. 4.

Therefore these claims are unexhausted and the petition should either be dismissed as containing unexhausted claims or the petitioner should opt to go forward on the remaining exhausted claims.

### C.    Even if Exhausted, Habeas Relief Must Be Denied.

If the court determines that the petitioner sufficiently raised the federal nature of the claims to the SJC, habeas relief is nevertheless unavailable.  The decision of the SJC must be upheld on habeas review where it is not contrary to, nor an unreasonable application of clearly established Supreme Court law.

### *Cross-examination of the defense expert.*

The petitioner claims that it was error for the trial court to allow the opinions of the defense expert, elicited on cross-examination, were those opinions where not based on a "reasonable degree of medical certainty."  Pet. Mem. at 17.  "On-cross-examination, the prosecutor posed a series of hypothetical questions to Dr. Brown concerning whether certain actions and behavior, if engaged in by an individual, would be 'consistent with' someone who 'knew what he was doing' or 'understood what he had just done."  *Rodriguez*, 437 Mass. at 563; S.A. Vol I, Ex. 4.  In reviewing the claim, the SJC relied on the standard set forth in *Commonwealth v. Jaime*, 433 Mass. 575, 577 (2001), "review[ing] the judge's ruling to determine error, and, if so, whether it was prejudicial."  The SJC held that the admitted testimony was not error, "where, as here, Dr. Brown's answers to the questions conformed to the 'consistent with' and 'could have' language expressly condoned in *Commonwealth v. Nadworny*, 396 Mass. 342, 359 (1985), *cert denied* 477 U.S. 904 (1986)."

Federal habeas corpus relief is not appropriate unless the alleged state evidentiary error reaches constitutional magnitude.  "Federal habeas corpus relief does not lie for errors of state

law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (*citing Lewis v. Jeffers*, 497 U.S. 764, 780

(1990)).  On federal habeas review the scope of review is "limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68; *see also* 28

U.S.C. § 2241.  As the court states in *Estelle*, "it is not the province of a federal habeas court to

reexamine state court determinations on state law questions." *Id.*  For a state evidentiary error to

reach the level of a constitutional violation, "[the] state evidentiary error must so infuse the trial

with inflammatory prejudice that it renders a fair trial impossible." *Petrillo*, 428 F.3d at 44

(*citing Subilosky v. Callahan*, 689 F.2d 7, 10 (1st Cir. 1982)).  The petitioner's claim does not

reach the level of Constitutional error.  In fact, it was not error at all.  It cannot be said, and the

petitioner fails to show, that the admission of the expert's opinion testimony "so infused the trial

with inflammatory prejudice that it renders a fair trial impossible." *Id.*  To the contrary, as the

SJC points out, the ability to question expert witnesses in this manner is particularly important

during cross-examination to probe the bases of that expert's opinion.  *See Id.*

### Facts Not In Evidence.

The petitioner claims that the prosecutor impermissibly assumed facts not in evidence

both in his questioning of the expert witness on cross-examination and in his closing arguments.

Specifically, during his cross-examination of the expert-witness the prosecutor asked the witness

"a hypothetical question about a scenario in which a person 'goes into a kitchen, grabs a knife,

*takes a bag, takes a hat* and heads out the door.'" (emphasis in original.)  *Rodriguez*, 437 Mass.

at 565; S.A. Vol I, Ex. 4.  Later, in closing, the prosecutor argued:

> '[The defendant] entered the store with a knife and *a bag, and a hat for a disguise .... He
> took the baseball hat.  He took the bag*, the tools of the trade of a robbery, and he headed
> out the door....  I ask you, Ladies and Gentleman, when an individual walks into a store

armed with a knife and *a bag of sufficient room to carry money, and a hat to cover a distinctive scar over his eye*, is that consistent with somebody who doesn't know what his is doing ...?' (emphasis in original.)

Id. at 565.

In analyzing this claim, the SJC did not hold that the prosecutor's use of this evidence during cross-examination and in his closing argument infringed on the petitioner's constitutional rights.  Rather, the SJC held that there was no error at all.  *Rodriguez*, 437 Mass. at 566; S.A. Vol I, Ex. 4.  In making this determination, the court reviewed the claim under the standard set forth in *Commonwealth v. Lamrini*, 392 Mass. 427, 432 (1984), which states: "'In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.'" *Rodriguez*, 437 Mass. at 565; S.A. Vol I, Ex. 4. (Internal citation omitted.)  The SJC found, with respect to petitioner's claim that there was no evidence that he purposely wore the hat, that:

> The baseball cap was found on the floor in the market by a Chelsea police officer.  It was identified by Melo, in statements made to her husband immediately after the stabbing, as belonging to her assailant.  Rosado testified that she observed a man wearing a dark baseball cap enter the market at the time of the incident and subsequently flee the market without a cap.  Finally, a witness, who shared the apartment with [the petitioner], identified the cap as having been missing from his room on April 13, 1997.  Given the uncontested existence of a distinctive scar on [the petitioner's] head, the overwhelming evidence linking the cap to [the petitioner], and the cap's use in the robbery, the prosecutor's statements were properly based on the facts in evidence and inferences permissibly drawn therefrom.

*Id.*

The petitioner further argued that the references to the bag found at the scene were improper because there was no evidence linking the bag to the petitioner and it was entered solely for identification purposes.  *See* Pet. Mem. at 22.  The SJC found, however, that:

> [B]oth Febres and Santiago testified that the bag found at the market belonged to
> Santiago, and Pimental testified that it did not belong to the store.  Where there was
> ample evidence that the bag in question was found at the scene of the robbery, and that it
> belonged to Santiago, with whom Rodriguez lived, we conclude that the prosecutor's
> statements were reasonable inferences to be drawn from the evidence.  There was no
> error.

*Rodriguez*, 437 Mass. at 566; S.A. Vol I, Ex. 4.

The SJC's analysis was entirely consistent with clearly established Supreme Court precedent.  Where, as here, a defendant alleges that a prosecutor used improper comments to secure a conviction, the "relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 643).  In making this determination, the Supreme Court has cautioned that courts must be careful not to view the prosecutor's comments in artificial isolation, but rather must view those comments in the context of the entire proceeding to determine whether the prosecutor's comments so affected the fairness of the defendant's trial that a new trial is warranted.  *United States v. Young*, 470 U.S. 1, 1-12 (1985).  In analyzing the due process claim, the Supreme Court considers the following: the closing argument as a whole, the trial judge's instruction to the jury concerning closing argument, and the strength of the government's case.  *Darden v. Wainwright*, 477 U.S. at 182; *see Donnelly v. De Christoforo*, 416 U.S. at 645.  These factors are substantively identical to the factors relied on by the SJC in reaching its determination that the prosecutor's statements did not violate the petitioner's due process rights.  *See Pagano*, 710 N.E.2d at 1039.  Therefore, the SJC's analysis of the prosecutor's use of the evidence during cross-examination and in his closing could not have been contrary to clearly established Supreme Court precedent.  *See*

*Taylor,* 529 U.S. at 404-05.

Nor was the SJC's decision an unreasonable application of *Darden* or *Donnelly.*
The SJC reasonably determined that the prosecutor's comments did not improperly affect the
jury's verdict. As set forth above, there was ample evidence at trial tying the petitioner to the
baseball cap and the bag in question. Where the prosecutor's use of evidence was not in error it
follows that the SJC was not objectively unreasonable in finding that such use did not violate the
petitioners due process rights under the Fourteenth Amendment.

### Appeals To Juror Sympathy

Likewise, the petitioner's claim that the prosecutor made improper appeals to the juror's
sympathies by referring to the victim's husband and children, in violation of his right to due
process, must fail. In his opening statement, the prosecutor stated:

> 'By all accounts, April 13 of 1997 started off like any other day for [the victim] and her
> family. That morning when they came to open the store, they had no idea that within a
> few short hours that day, that normal Sunday morning, a morning not unlike any morning
> they had come to open the store, would turn into that family's worst nightmare. Within a
> few short hours [the victim's husband] would lose his wife. The children would lose
> their mother, and [the victim] would lose her life.' Shortly thereafter, the prosecutor
> continued, 'Earlier that morning [the victim's husband] took his young son ... and they
> went downstairs to the basement to take a nap. [The victim's seven year old daughter]
> decided she wanted to stay upstairs with her mom, so she remained behind the counter of
> that store, sleeping on a comforter. It was about seven minutes before a man would enter
> that store and change that family's life forever.'

*Rodriguez*, 437 Mass. at 566-67; S.A. Vol I, Ex. 4. During closing, the prosecutor stated:

> 'But what happens when you're in the right place at the right time, and you none the less
> meet a violent end? That's the story of [the victim], a 32-year-old store clerk who was
> cut down inside her very own convenience store in Chelsea, a store that she owned with
> her husband for about two years, a store that she had worked in countless other times
> before, a store that she thought nothing of bringing her family there, her daughter, her
> son, a place where she thought nothing about working behind that counter alone, a place
> that [the victim's husband] thought nothing about going downstairs and taking a nap. Yet

23

> [the victim] was brutally murdered inside her convenience store, fatally stabbed over what ended up being a mere 60 dollars in U.S. Currency....  The [d]efendant testified that he came to this country because he wanted to make a better life for himself.  Well you know, so did [the victim].  She, too, was Hispanic.  She came to this country, married, three children, owned a store.  She functioned in a city.  The defendant apparently could not, but unfortunately for [the victim], she was in the right place at the right time.'

*Id.*  The SJC held that, "While the prosecutor's references to the victim's family and children in his opening and closing were certainly sympathetic, they were not excessive, nor were they the focal point....When viewed in the context of his entire argument, we do not find the prosecutor's statements to have been improper."  *Id.* at 367-368 (*referencing Commonwealth v. Degro*, 432 Mass. 319, 326-327 (2000); *Commonwealth v. Sanna*, 424 Mass. 92, 107-108 (1997)).  The SJC's holding is consistent with the clearly established Supreme Court precedent set forth in *Darden* or *Donnelly* where the court reviewed that argument as a whole and determined that the prosecutor's opening and closing arguments where proper.

The SJC's decision cannot be said to be an unreasonable application of *Darden* or *Donnelly* where the SJC reviewed the argument as a whole and found that the references to the victim's family and children where not excess, and were not the focal point of the opening and closing statements.  *See Rodriguez*, 437 Mass. at 567; S.A. Vol I, Ex. 4.  Therefore, it was not objectively unreasonable for the court to find that the prosecutor's references to the victim's family and children in the opening and closing were not improper and did not violate the petitioner's due process rights.

III.    **THE SJC'S HOLDING THAT THE PETITIONER WAS NOT DENIED THE
EFFECTIVE ASSISTANCE OF COUNSEL WAS NOT CONTRARY TO, NOR
AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED
SUPREME COURT LAW.**

A.    **The Ineffective Assistance standard.**

In *Williams v. Taylor*, 529 U.S. at 390-91, the Supreme Court held that *Strickland v. Washington*, 466 U.S. 668 (1984) was the clearly established federal law that controlled claims related to ineffective assistance of counsel. The *Strickland* analysis may be stated as follows: to determine whether counsel's performance was sufficient under the Sixth Amendment, the inquiry "is whether counsel has brought 'to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'" *Scarpa v. DuBois*, 38 F.3d 1, 8 (1st Cir. 1994), *cert denied*, 513 U.S. 1129 (1995), *quoting Strickland v. Washington*, 466 U.S. at 688; *see Bell v. Cone*, 535 U.S. at 694. In state court, the petitioner bore the heavy burden of proving ineffective assistance, *Scarpa v. DuBois*, 38 F.3d at 8-9; *Lema v. United States*, 987 F.2d 48, 51 (1st Cir. 1993), which required a two part analysis. First, the petitioner was required to demonstrate to the state court that "in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. at 690. That is, he needed to establish "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The standard "demands a fairly tolerant approach," *Scarpa v. DuBois*, 38 F.3d at 8, as the Constitution does not guarantee "a letter-perfect defense or a successful defense." *United States v. Natanel*, 983 F.2d 302, 309 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992); *see Williams v. Taylor*, 529 U.S. at 390-91; *Matthews v. Rakiey*, 54 F.3d 908, 319 (1st Cir. 1995). On direct review, "'[judicial scrutiny] of counsel's performance must be

highly deferential,'" *Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002), quoting *Strickland v. Washington*, 466 U.S. at 689.

But that is only the first part of the test. The petitioner also was required to demonstrate to the state court that he was prejudiced by counsel's alleged errors - - that is, he was required to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694; *Scarpa v. DuBois*, 38 F.3d at 8, 16; *see Bell v. Cone*, 535 U.S. at 694. Further, counsel's alleged blunders were not to be "judged solely by the 'surrounding circumstances' of the representation, but rather, [were to] be judged [by the state court] in light of the whole record, including the facts of the case, the trial transcript, the exhibits, and the applicable substantive law." *Scarpa v. DuBois*, 38 F.3d at 15; *see Matthews v. Rakiey*, 54 F.3d at 911. Finally, the habeas standard requires the federal court to take yet another step back and permits the habeas court to grant relief only if the petitioner can prove that the state court's conclusion was objectively unreasonable. *Bell v.Cone*, 535 U.S. at 686.

> **B.** **The SJC's Decision, That The Petitioner Received the Effective Assistance of Counsel, Was Neither Contrary to, Nor an Unreasonable Application of, <u>Clearly Established Supreme Court Law</u>.**

The SJC's decision, that the petitioner received the effective assistance of counsel, was neither contrary to, nor an unreasonable application of clearly established Supreme Court law. The petitioner claims that trial counsel was ineffective where he (1) failed to object to the judge's instructions on the presumption of innocence and the use of assumed facts in questioning the expert witness; (2) failed to object to or move to strike the prosecutor's references to Rodriguez wearing a cap as a means of disguising himself; and (3) failed to object to or move to strike the

26

prosecutor's sympathy appeal to the jury during his opening statement and closing argument.  *See* Pet. Mem. at 30-31.  The SJC held that because all of counsel's alleged failures related to claims that were not held to be errors at all, the ineffective assistance of counsel claim based on those failure to object must fail as well.  *See Rodriguez*, 437 Mass. at 568; S.A. Vol I, Ex. 4. Citing *Commonwealth v. Murphy,* 426 Mass. 395, 404 (1998) (holding that where defendant fails to show that alleged errors warrant reversal under G.L. c. 278, § 33E, then he cannot succeed on an ineffective assistance claim based on counsel's failure to object to those same errors.)

It is well established "[t]hat 'the substantial likelihood of a miscarriage of justice' standard is 'more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel.'  Thus, if the SJC found that the 'substantial likelihood of a miscarriage of justice' standard was not met, it must have concluded that the *Saferian/Strickland* standard for ineffective assistance of counsel was not met as well." *Mello v. DiPaulo*, 295 F.3d 137, 144 (1st Cir.2002) (quoting *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992)).  Where, as here, the state court applies a standard more favorable to the petitioner, the AEDPA standard governs the review.  *McCambridge v. Hall*,  303 F.3d 24, 35 (1st Cir.2002).  Therefore, the review is whether the SJC's decision that there was no substantial likelihood of a miscarriage of justice "was contrary to, or involved an unreasonable application of clearly established Supreme Court law.  For the reasons set forth in great detail above, infra at 8-12, 18-23, it is clear that the SJC's determination that there was no ineffective assistance of counsel was not contrary to or an unreasonable application of Supreme Court law where the court found no error as a matter of state law as to any of the petitioner's claims and it was not objectively unreasonable to determine that no prejudice to the petitioner existed.

**IV.    THE PETITIONERS CLAIM UNDER MASSACHUSETTS GENERAL LAWS c. 278, § 33E IS NOT COGNIZABLE ON FEDERAL HABEAS REVIEW.**

The petitioner asserts that he was denied a fair trial by the cumulative impact of all the alleged errors made at trial.  *See* Pet. Mem. at 31.  After reviewing the entire record as required by M.G.L. c. 278, § 33E, the SJC declined to exercise its authority to reduce the jury's verdict or order a new trial.  *See Rodriguez*, 437 Mass. at 568; S.A. Vol I, Ex. 4.  This is clearly a state law claim based upon a specific Massachusetts statute.  *See* M.G.L. c. 278, § 33E.  M.G.L. c. 278, § 33E vests exclusive appellate jurisdiction in capital cases to the SJC.  *See Commonwealth v. Anguilo*, 415 Mass. 502, 508 (1993).  The scope of the courts review under the statute is significantly broader than that available to a defendant in noncapital cases.  *Id*.  Under M.G.L. c. 278, § 33E, the SJC must "review the 'whole case' to determine whether the verdict is 'against the law or the weight of the evidence.'"  *Id. citing Dickerson v. Attorney Gen.*, 396 Mass 740, 741 (1986).

Errors of state law are not a cognizable basis on federal habeas review, a federal court must not re-examine the SJC's determination of a state-law question.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  "Federal courts sitting in habeas must accept state court rulings on state law issues.  An inquiry into the correctness of a ruling on state law issues 'is not part of a federal court's habeas review of a state conviction.'"  *Rodriguez v. Spencer*, 412 F.3d 29, 37 (1st Cir.2005).  Therefore, the petitioner is not entitled to habeas relief for this claim.

<u>**CONCLUSION**</u>

For the foregoing reasons, the petition for habeas corpus relief should be denied.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

 /s/ Jonathan Ofilos
Jonathan Ofilos
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2634
BBO # 658091

Dated: October 11, 2006

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 11, 2006.

 /s/ Jonathan Ofilos
Jonathan Ofilos